IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2016

## STATE OF TENNESSEE v. GREGORY CHARLES DIXON

**Appeal from the Circuit Court for Lawrence County**
**No. 31764    Stella Hargrove, Judge**

---

**No. M2016-00620-CCA-R3-CD – Filed October 26, 2016**

---

The defendant, Gregory Charles Dixon, appeals his Lawrence County Circuit Court jury conviction of theft of property valued at $1,000 or more but less than $10,000, claiming that the evidence was insufficient to sustain his conviction and that the sentence imposed was excessive.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Michael Thorne, Lexington, Tennessee (on appeal); and Patrick S. Butler, Waynesboro, Tennessee (at trial), for the appellant, Gregory Charles Dixon.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Mike Bottoms, District Attorney General; and Gary Howell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Lawrence County Grand Jury charged the defendant with one count of theft of property valued at $1,000 or more but less than $10,000, arising out of the sale of a counterfeit diamond.  The trial court conducted a jury trial in June 2015.

The State's proof at trial showed that, in the fall of 2011, Amy and Jason Statum were discussing plans to marry and were in the process of finding an engagement ring.  Mrs. Statum found a ring ("the ring") that she liked at Dixon Jewelers ("the store"), owned by the defendant in Lawrenceburg, Tennessee; the ring was purportedly a two-carat, round diamond solitaire.  According to Mrs. Statum, the defendant stated that a customer had previously attempted to buy the ring but that, due to being injured in an

accident, the customer could no longer afford to make the purchase. The defendant informed Mrs. Statum that the price of the ring was $8,000. Mrs. Statum took a photograph of the ring to show Mr. Statum, and the defendant told her to "text him" when she returned to town and he "would try to be" at the store to meet them.

In April 2012, Mrs. Statum sent a text message to the defendant that she was returning with Mr. Statum, and the defendant was present at the store when the couple arrived on April 7. The defendant told the Statums that the ring "was SI1 in clarity and a G in color." Before purchasing the ring, Mr. Statum asked the defendant for an appraisal, and the defendant responded that "he would try to get us one from the company that he got the ring from" but that he "had a hard time getting appraisals from the company." Mr. Statum then paid the defendant $8,000 in cash, which was Mr. Statum's "life savings," and the couple left with the ring. Aside from the receipt for the purchase, the defendant did not provide the Statums with any additional paperwork. Because the Statums were not yet officially engaged, Mrs. Statum locked the ring inside a safe at her residence. Mr. Statum testified that he did not have a key to the safe and that he did not know the location of the key.

One to two months later, Mrs. Statum returned to the store to have the ring sized. The defendant took the ring to a jeweler in the back of the store, and Mrs. Statum stayed at the store for "45 minutes to an hour" while the ring was being sized. Mrs. Statum was able to see the jeweler in the back room "working on jewelry" while she waited. The defendant returned the adjusted ring to Mrs. Statum, and she left the store.

In late May of 2013, approximately two weeks before their June 8, 2013 wedding date, the Statums began searching for wedding bands. Their search led them to B&B Jewelers in Huntsville, Alabama, a jewelry store which had been recommended to them. While looking at wedding bands, the Statums noticed that the bands containing diamonds did not match the color of the stone in Mrs. Statum's ring. The Statums then asked store employee Jona McCauley to assist them in finding a band which would match the ring.

Ms. McCauley, a graduate gemologist and the assistant manager of B&B Jewelers, testified as an expert in the field of identification and evaluation of gems and gemstones. Ms. McCauley stated that she was a graduate of the Gemological Institute of America, that she had been a gemologist for 37 years, and that she had worked in the jewelry business for 19 of those 37 years. Ms. McCauley testified about the different types of instruments jewelers use to examine gemstones, including microscopes, loupes, and laser welders, all of which use magnification to examine gemstones. In addition, Ms. McCauley explained that jewelers can use diamond testers, which are electronic devices

that, when touched to gemstones, will "light[] up green for diamond and red for another stone."

When Ms. McCauley first saw Mrs. Statum's ring, she noticed that the stone "wasn't the white that [she] would think of when [she] see[s] a diamond." Thinking that the ring might need cleaning, Ms. McCauley asked Mrs. Statum if she could clean and examine the ring, and Mrs. Statum agreed. Ms. McCauley initially examined the ring under a microscope and "realized it did not look like a diamond," noticing that it did not possess the "sharp facets" of diamonds:

> The facets on the diamond are knife edge sharp. There's nothing else out there that has the hardness of 10, that has the knife edge sharp facets of a diamond. And this was more rounded, more molded look of a stone.

Ms. McCauley then took the ring to the back, cleaned it, and examined it through a jeweler's loupe. At this point, her belief that the stone was moissanite[1] was confirmed. Because her boss happened to be in the back of the store, she asked him to examine the ring using the laser welder, which has higher magnification capabilities. Upon his examination, he agreed with Ms. McCauley's assessment that the stone was moissanite.

After having the ring in the back area of her store for "maybe five minutes," Ms. McCauley returned to the front and informed the Statums, "'I hate to tell you this, but this is not a genuine diamond.'" Mrs. Statum testified that she "almost fell on the floor" from the shock of that revelation, and Mr. Statum "felt sick at [his] stomach." Ms. McCauley testified that, although she had observed and was familiar with the process of placing a stone in a jewelry setting, she had never performed such repairs. Ms. McCauley also confirmed that the ring was "in excellent condition and had been professionally set," testifying that if an amateur had attempted to replace the stone using "little screwdrivers and pliers," she would have known. Ms. McCauley estimated that it would take a professional jeweler "probably . . . an hour or two" to replace the stone in Mrs. Statum's ring.

The following day, Mr. Statum returned to the defendant's store and asked the defendant to provide him with an appraisal. The defendant reiterated that he was "still having trouble with" the company. Mr. Statum testified that the following exchange then took place:

---

[1] Although not specifically defined in the record, this court takes judicial notice that moissanite is a naturally-occurring silicon carbide which is used as a diamond alternative. *See* Tenn. R. Evid. 201(b), (c).

I said, "Well, Greg, the reason you can't get an appraisal is because this isn't a real diamond."

And he said, "What?"

I said, "I've got a report here that says that this is a substance called 'moiss[a]nite.' It's not real.

And you sold me this ring for $8,000 and I want my money back."

And he took out his glass, and looked at it, and he agreed. He said, "It's not real. It's not a diamond."

. . . .

He – he said, "Well, I'm going to do whatever it takes to make this right."

I said, "Well, Mr. Dixon, I just want my money back."

He said, "Well, I don't have that kind of money on hand here at the store."

He said, "If you wait until my mother and my father come back, they had gone to a doctor's appointment, I don't want to leave my shop unattended."

He said, "I'll go and talk with some friends of mine that I loaned some money to. I'll see if I can't get the money together for you."

Mr. Statum waited at the store until the defendant's parents arrived 30 to 45 minutes later, at which time the defendant left. Mr. Statum continued to wait at the store. Approximately 90 minutes to two hours later, the defendant returned and told Mr. Statum that he would not refund the money because he could not be sure that Mr. Statum "didn't switch this diamond." The defendant insisted that he had not sold a counterfeit diamond to Mr. Statum. Mr. Statum then proceeded immediately to the Lawrenceburg Police Department to file a police report against the defendant.

Mrs. Statum confirmed that, with the exception of the ring sizing at the store and the five minutes that Ms. McCauley had the ring to clean it, the ring had been in her sole possession since the April 7, 2012 purchase date. Mrs. Statum did not begin wearing the ring until June 4, 2012, when Mr. Statum officially proposed in Savannah, Georgia. Both Mr. and Mrs. Statum denied that they had replaced the stone in the ring or that they had asked anyone else to do so. Ms. McCauley also denied that she had replaced the Statums' original stone with a moissanite.

Mr. Statum testified that he later purchased a second engagement ring from B&B Jewelers after learning that the diamond in the ring he had previously purchased was not genuine. He explained that he "had to obtain some financing" in order to purchase the new ring. The Statums also asked Ms. McCauley to appraise the original ring, which she estimated to be worth $1,880 in May of 2013.

With respect to purchase practices at her store, Ms. McCauley testified that customers purchasing diamond engagement rings from B&B Jewelers would receive a detailed receipt as well as an appraisal. Ms. McCauley admitted that, if a diamond was certified, she might have to contact the vendor for a copy of the appraisal if her store did not have one in its possession but that such a process would not take 13 months.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant elected to testify and chose to present proof.

Johnny Turner, an employee of Lon's Jewelers in Alabama, testified that he had worked for the defendant since "the mid '90's," doing contract work to repair jewelry. Mr. Turner stated that it would take him "about five minutes" to remove a stone from a ring and replace it with another similar-sized stone. Mr. Turner also stated that he had never known the defendant to carry or sell moissanite in the store.

The defendant testified that he had been in the jewelry business since the mid-1990s and that he was the owner of the store. He denied selling moissanite, and he insisted that the ring he sold Mr. Statum contained a diamond "[b]ecause I don't sell nothing else." The defendant stated that he used a diamond tester to test the stone at issue when it first came into his possession and that he found it to be a "really sharp stone."

The defendant explained that the door to the room where jewelry repairs are performed always remained open, and he stated that he did not perform any repairs; instead, he hired part-time employees to do repair work. When Mrs. Statum brought the ring in to be sized, the defendant took the ring from her, delivered it to the repairman in the back room, and then returned to the front of the store to talk to Mrs. Statum. The

defendant estimated that it took his repairman approximately 20 minutes to resize the ring.

The defendant described the day in May 2013 on which Mr. Statum confronted him at the store about the counterfeit diamond:

> He came in there and told me that we had an issue, that I sold him a fake stone. I was like, "Well, where's it at? I want to see it."

> I was like, "Cause I don't believe it."

> He showed me the ring. I looked at it through my eye piece. I said, "You're right. This is a stone, . . . a fake stone."

> He says, "That's the one you sold me."

> I said, "No, it's not."

> . . . .

> He pretty much was firm that he wanted his money back that day.

> . . . .

> Well, I sort of – I ain't never had this problem, because I don't sell fake stones. I said, "Well, you'll have to wait, because, you know, I mean, I want to make it right. That's my name that's out there and that means a lot in a little town."

> He – I told him about my mom, that, you know, she would be back in a minute. After that, I sort of – you know, I knew I didn't sell him a stone that was fake, so when I left, I tried to call you to see what – my options.

After speaking with an attorney, the defendant returned to the store and told Mr. Statum "what [he] needed to say." The defendant testified that he had never before been accused of selling fake stones and that he was unaware of any complaints that had

been filed against him with the Better Business Bureau.  The defendant reiterated that he was "100 percent sure" that he had sold Mr. Statum a genuine diamond.

On cross-examination, the defendant stated that when Mrs. Statum first visited the store, she specifically requested a two-carat diamond solitaire, and the defendant explained that he did not have one in stock but that he could have one "overnight[ed]" to the store.  Mrs. Statum did not return to the store for "several weeks." In the meantime, the defendant purchased the ring at issue "from an individual" whose name the defendant could not recall.  The defendant explained that this person had stopped in the store and asked the defendant to buy the ring because the man "had some trouble in life."  Although the defendant would not typically buy a stone so large, he agreed and paid the man $2,000.

Approximately two months after the defendant purchased the ring, the Statums visited the store.  The defendant acknowledged that Mr. Statum had asked about an appraisal on the ring, and the defendant stated that he had replied, "'That will be no problem.'"  According to the defendant, he did not possess the proper "fill-in-the-blank forms" he needed to provide the Statums with an appraisal because the company from which he purchased the forms "didn't have them."  The defendant agreed that the Statums had mistakenly believed that the appraisal itself would come from an independent company; instead, the defendant would have made and signed the appraisal for them if he had possessed the proper form.  The defendant admitted that there was a print shop in Lawrence County.

When Mrs. Statum arrived to have the ring sized, the defendant gave the ring to Mr. Turner, who was present that day doing jewelry repairs.  When Mr. Statum came to the store in May 2013 to demand a refund for the counterfeit diamond, the defendant told him before leaving the store that "the stone that he brought in there wasn't the stone that I sold him."  When asked if he believed that someone had switched the stones and that Mr. Statum had driven to the store from Alabama in an attempt to cheat the defendant out of $8,000, the defendant responded in the affirmative.  The defendant conceded, however, that he never reported this attempted scam to the police.

Based on this evidence, the jury convicted the defendant as charged of theft of property valued at $1,000 or more but less than $10,000.  Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of two years and six months' incarceration.  Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the evidence was insufficient to support his conviction and that the sentence imposed was excessive. We will address each issue in turn.

## I. Sufficiency

The defendant first contends that the evidence adduced at trial was insufficient to support his conviction. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. "Effective consent" is defined as "assent in fact, whether express or apparent, including assent by one legally authorized to act for another." *Id.* § 39-11-106(a)(9). Consent is not considered effective when it has been "[i]nduced by deception or coercion." *Id.* § 39-11-106(a)(9)(A).

Here, the proof adduced at trial in the light most favorable to the State established that Mr. Statum paid $8,000 to the defendant for a ring that purportedly contained a two-carat diamond solitaire. The defendant testified that he had previously purchased the ring for only $2,000 from a man whose name the defendant could not recall. The defendant did not provide Mr. Statum with any paperwork on the ring, and when Mr. Statum inquired about an appraisal, the defendant indicated that he would

- 8 -

attempt to obtain one but that he "had a hard time getting appraisals from the company." Although Mr. Statum was under the impression that the appraisal would be coming from a third party, the defendant admitted that he would have been providing the appraisal but that he did not have the appropriate "fill-in-the-blank" form.

Over a year after purchasing the ring, the Statums patronized B&B Jewelers, where they learned for the first time that the stone they believed to be a diamond was actually moissanite and was only worth $1,880. Ms. McCauley, who testified as an expert in the field of identification and evaluation of gems and gemstones, questioned the authenticity of the gemstone almost immediately upon viewing it. Following an approximate five-minute examination, during which both she and her superior viewed the stone using a total of three different magnification devices, she verified that the stone was in fact moissanite.

When Mr. Statum confronted the defendant with the counterfeit diamond the following day, the defendant used a diamond tester and instantaneously agreed that the stone was "a fake." Although the defendant denied that he had sold Mr. Statum a moissanite instead of a diamond, the Statums and Ms. McCauley all testified that none of them had "switched" the stone in the ring, and the Statums insisted that no one had switched the stones at their behest. The jury clearly rejected the defendant's testimony on this issue and accredited that of the Statums and Ms. McCauley, which was its prerogative.

The defendant attempts to include within his sufficiency argument the assertion that the State failed to prove a proper chain of custody of the ring. However, the defendant failed to object to the chain of custody at trial, and he has thus waived our review on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific objection is not apparent from the context."). In any event, we perceive this argument not as a chain of custody issue but rather as one of witness credibility. The jury clearly believed Mrs. Statum when she testified that, but for the resizing of the ring at the store and the five minutes that Ms. McCauley had it for examination and cleaning at B&B Jewelers, the ring had remained in her sole possession since the April 7, 2012 purchase date, and the jury obviously rejected the defendant's theory that the stones had been switched and that Mr. Statum was attempting to swindle him out of $8,000.

Taking all of this evidence into consideration, the evidence supports the jury's finding that the defendant intended to deprive Mr. Statum of his money by deceiving Mr. Statum into purchasing a counterfeit ring for $8,000 which was worth no more than $2,000 and that the defendant acted knowingly. Thus, the evidence strongly supports the defendant's conviction of theft of property valued at $1,000 or more but less than $10,000.

*II. Sentencing*

The defendant also contends that the fully-incarcerative, two-year-and-six-month sentence imposed by the trial court is excessive and that the trial court erred by denying his request for probation. Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The imposition of a two-and-a-half-year sentence in this case mandated the trial court's consideration of probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Traditionally, the defendant has born the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "'subserve the ends of justice and the best interest[s] of both the public and the defendant.'" *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956)), *overruled on other grounds by State v Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). The supreme court expanded the holding in *Bise* to the trial court's decision regarding probation eligibility, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the

purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

*Id.*

At the sentencing hearing in the instant case, the testimony revealed that the defendant was afflicted with cerebral palsy at birth, which caused problems with perambulation. The defendant explained that he was unable to use crutches or a walker, so he had fashioned his own walking stick to assist him. The defendant testified that he worked alone in the store and had no full-time employees and that the store was his means of income. The defendant admitted that he had a prior conviction for driving under the influence and an open container violation. When questioned about the circumstances surrounding the sale of the ring, the defendant maintained his position that the stone in the ring had been replaced after he had sold it to the Statums and that he had been "scammed."

With the testimony of Beth Ladner of the Tennessee Office of Probation and Parole, the State introduced into evidence the defendant's presentence report. Ms. Ladner testified that the defendant would be able to perform some type of community service work despite his physical limitations and that there were organizations that would

be willing to work with the defendant. Ms. Ladner stated that she had no concerns with the defendant's ability to participate in supervised probation.

At the conclusion of the sentencing hearing, the trial court issued its ruling from the bench, basing its decision on consideration of the evidence adduced at trial and at the sentencing hearing, the presentence report, principles of sentencing, the parties' arguments, the nature and characteristics of the crime, evidence of enhancing and mitigating factors, statistical information as to similar sentencing, and the defendant's potential for rehabilitation. The court determined that no enhancement factors applied and found that both the defendant's poor health and the fact that the crime neither caused nor threatened serious bodily injury were applicable mitigating factors. The court emphasized its concern that the defendant had several opportunities to provide the Statums with an appraisal and never did so and that the defendant still refused to take responsibility for his actions. The court specifically found the credibility of the victims to be "noteworthy," stating that they had "far more credibility" than the defendant, who the court "[did] not believe." Because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of this within-range sentence.

With respect to the defendant's desire for probation, the court stated that it needed to "consider whether or not the interests of society are being protected from future criminal conduct," noting that the defendant had sold "a fake diamond for $8,000" and failed to "accept[] responsibility." The court also expressed concern that a sentence of full probation "would unduly depreciate the seriousness of the offense" and that "confinement [was] particularly suited to provide an effective deterrent to those likely to commit similar offenses." Given the defendant's failure to take responsibility for his actions and the court's concerns over depreciating the seriousness of the offense and effectively deterring others, the trial court did not abuse its discretion by ordering a fully-incarcerative sentence.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE